**UNITED STATES of America**

v.

**Melvin E. JACKSON, Appellant.**

**UNITED STATES of America**

v.

**John JOHNSON, Appellant.**

**Nos. 76–1500 and 76–1584.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1977.

Decided Aug. 11, 1977.

Rehearing Denied Oct. 26, 1977.

David E. Schreiber, Washington, D. C. (appointed by this court), for appellants.

Thomas G. Corcoran, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Albert H. Turkus, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

Opinion for the court filed by McGOWAN, Circuit Judge.

Opinion filed by MacKINNON, Circuit Judge, concurring in part and dissenting in part.

McGOWAN, Circuit Judge:

These consolidated appeals present troublesome questions about the division of criminal jurisdiction between the federal and local courts in the District of Columbia. When alleged U.S.Code and D.C.Code violations are properly joined in a single indictment, the District of Columbia Court Reform and Criminal Procedure Act of 1970 permits all crimes charged to be tried together in the United States District Court. In this case, however, we decide that the District Court lacked jurisdiction over the D.C. robbery offense charged in appellants' indictment. We hold first that the robbery count was improperly joined with the remaining offenses of which appellants were accused. Alternatively, we hold that, even if the original joinder of the robbery count

was proper, the District Court divested itself of jurisdiction over that count when it granted appellants' pretrial motion to sever the robbery charge in order to avoid the possibly prejudicial atmosphere of a single trial.

Accordingly, we reverse appellants' robbery conviction. Finding no infirmity with the other convictions challenged here by appellant Jackson, we affirm that portion of the District Court's judgment which reflects the jury's verdict in appellants' first trial.

I

The events giving rise to these appeals occurred near a tavern in southwest Washington in the early morning hours of April 26, 1975. At about 1:45 A.M., two women, Dari Tritt and Kathy Kirch, left the Pier Nine restaurant and bar. Almost immediately, they were accosted at gunpoint by a man who had just emerged from a late-model gold Chevrolet parked near the intersection of Half and V Streets. This individual, later identified as appellant Jackson, instructed the women to walk toward the Anacostia River. When Ms. Kirch attempted to "talk [her] way out of it," Jackson hit her across the face with sufficient force to knock her to the ground and cause bleeding. The women proceeded to walk in the direction indicated by their assailant. Arriving at the water's edge, they were ordered to disrobe. When they did not comply quickly enough, their attacker ripped off Ms. Kirch's blouse. After Ms. Kirch had also removed her bra, Jackson's attention was distracted by a noise, and Ms. Kirch was able to wrest the sawed-off rifle from his grasp. Jackson fled, and the two women returned to the Pier Nine bar and notified police.

A short while later, Marliese Nakamura, her mother, and a male friend left the Pier Nine, and walked to their nearby car. As they were about to enter, another car, a gold Chevrolet, approached slowly. A man in the passenger seat of the Chevrolet reached out the car window and grabbed Ms. Nakamura and her purse. The young woman was dragged approximately ten feet before she let go of her handbag. The bag contained a topaz necklace, a checkbook, various pieces of identification, a small evening purse belonging to Ms. Nakamura's mother, and a wallet belonging to Lawrence Gorman, the friend. Among the contents of the elder Ms. Nakamura's purse were three of her lipstick cases and a prescription bottle belonging to her daughter. Mr. Gorman's wallet contained approximately $100 in cash.

After the purse snatching, Mr. Gorman and the Nakamuras chased the gold Chevrolet in their own car. Although the fleeing car eventually managed to elude its pursuers, Mr. Gorman and the Nakamuras were able to obtain the Chevrolet's license plate number, and to observe that its occupants were two black men, one of whom, the driver, was wearing a green print shirt. When the chase proved unsuccessful, the trio returned to the Pier Nine bar and called the police.

Upon receiving the gold Chevrolet's license number from Mr. Gorman, the police checked the registration and found that the car's owner listed a home address in the 700 block of 12th Street, Southeast. Approaching this location in his squad car, Metropolitan Police Lieutenant Spurlock saw a gold Chevrolet bearing a license number which matched that obtained from Mr. Gorman and Ms. Nakamura. At 12th and I Streets, Southeast, Lt. Spurlock stopped the car, and arrested its occupants, appellants Jackson and Johnson. Appellant Johnson was wearing a shirt like that described by Mr. Gorman and the Nakamuras. The Chevrolet was also taken into custody. A subsequent search of the car revealed a sack of rifle ammunition of the same caliber as the weapon which Ms. Kirch had taken from her assailant. Also discovered in the Chevrolet were Ms. Nakamura's handbag, her prescription bottle, and her mother's lipstick. None of the remaining contents of the purse were found.

Informed of appellants' arrest, police at the Pier Nine bar brought Dari Tritt and Gisela Nakamura, Marliese's mother, to the

southeast Washington location where appellants had been apprehended. Ms. Tritt was unable to identify either appellant as the man who forced her and Ms. Kirch to accompany him to the river bank. However, the elder Ms. Nakamura, relying primarily on the color and pattern of appellant Johnson's shirt, did identify Johnson as the driver of the gold Chevrolet. Appellants were then taken to George Washington University Hospital, where Ms. Kirch had gone for X-rays. Ms. Kirch did not recognize appellant Johnson, but she did identify appellant Jackson as her attacker.

In a nine-count indictment filed on May 22, 1975, appellants were each charged with possession of an unregistered firearm (26 U.S.C. § 5861(d) (1970)); possession of a firearm not identified by serial number (26 U.S.C. § 5861(i)); robbery (22 D.C.Code § 2901 (1973)); assault with intent to commit rape while armed (two counts; 22 D.C. Code §§ 501, 3202); assault with intent to commit rape (two counts; 22 D.C.Code § 501): and assault with a dangerous weapon (two counts; 22 D.C.Code § 502).

With the exception of the robbery count, all charges against appellants stemmed from the incident involving Ms. Tritt and Ms. Kirch. As a consequence, trial counsel for appellants moved to sever the robbery count, alleging both improper joinder under Fed.R.Crim.P. 8, and the likelihood of prejudice within the meaning of Fed.R.Crim.P. 14. The motion was granted by the District Court,[1] and appellants were tried on the remaining eight counts of the indictment. At the conclusion of this trial, on November 20, 1975, appellant Johnson was acquitted; and appellant Jackson was convicted of possession of an unregistered firearm and two counts of assault with intent to commit rape while armed. Approximately six months later, appellants were tried in District Court on the robbery charge which had been severed. Both were convicted. For

his offenses, appellant Jackson was sentenced to concurrent terms under the Youth Corrections Act, 18 U.S.C. § 5010(b) (1970). On the basis of his robbery conviction, appellant Johnson was sentenced to a prison term of twenty months to five years.

## II

■ Of the numerous assignments of error pressed upon us, only those concerning the District Court's jurisdiction over the robbery count merit extended discussion. As a preliminary matter, we briefly dispose of two other arguments advanced by appellants. We believe first of all that the police unquestionably had probable cause to arrest appellants when they did. A gold Chevrolet was mentioned prominently in reports of two crimes occurring in the vicinity of the Pier Nine bar. Appellants were observed driving such a vehicle near that general location shortly after the crimes were committed. Moreover, the license number of appellants' car matched exactly the number of the gold Chevrolet obtained from the victims of one of the crimes. Taken together, these circumstances surely constituted probable cause for arrest.

■ Likewise, we are not persuaded by appellant Jackson's contention that the evidence was insufficient to support his conviction of assault with intent to commit rape while armed. The requisite intent need not be proved by direct evidence, but may be inferred from the totality of the circumstances presented to the jury. Here, the evidence adduced at trial tended to show that appellant Jackson led Ms. Tritt and Ms. Kirch at gunpoint to a secluded spot on the bank of the Anacostia River, and then ordered them to remove their clothing. In addition, testimony indicated that Jackson impatiently ripped off Ms. Kirch's blouse when she failed to follow instructions swiftly enough. From these facts, we believe

---

1. Subsequently, the district judge disclosed that he had granted the motion "upon a finding that a trial of this count . . . with the other eight counts of the indictment would be prejudicial to the defendants." Order, December 1, 1975. The judge reiterated his explana-

tion at a later date. "[S]everance was granted to avoid possible prejudice to the defendants and assure a fair trial. The court did not find or believe the counts to be otherwise improperly joined." Memorandum Opinion and Order, January 21, 1976.

the jury could permissibly infer beyond a reasonable doubt that Jackson possessed the intent necessary to sustain a conviction for the offense charged. While no purpose would be served by detailed commentary on the cases cited by appellant in support of a contrary position, we have examined those precedents and find them clearly distinguishable from the present case.

## III

■ We turn now to the only substantial issue presented by these appeals, namely, the propriety of appellants' robbery conviction. At the outset, we look to the language of the relevant jurisdictional statute, 11 D.C.Code § 502(3) (1970):

> [T]he United States District Court for the District of Columbia has jurisdiction of . . . [a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense.

The word "joined" in this provision must be construed to mean "properly joined under Fed.R.Crim.P. 8." If it were not so construed, federal jurisdiction over purely D.C. offenses could be invoked any time a defendant faced prosecution for both federal and D.C. crimes, regardless of how unconnected or dissimilar those crimes might be. If "joined" did not mean "properly joined," jurisdiction over D.C. offenses could be conferred upon the District Court by the simple expedient of adding at least one federal count to any indictment. Plainly, this would be an unacceptable situation, since a major purpose of the District of Columbia Court Reform and Criminal Procedure Act

of 1970 was to shift general jurisdiction over D.C.Code offenses from the United States District Court to the Superior Court of the District of Columbia.

■ In order to determine whether joinder of the robbery count with the rest of the indictment was proper in this case, we look to Fed.R.Crim.P. 8.[2] Where multiple defendants are involved, Fed.R.Crim.P. 8(b) governs both joinder of offenses and joinder of defendants. This is certainly not apparent from the language of the Rule itself. Rule 8(a) is entitled "Joinder of Offenses," and Rule 8(b) is labelled "Joinder of Defendants." Nevertheless, the weight of authority in this circuit and elsewhere regards Rule 8(b) as providing the sole standard for determining the permissibility of joinder of offenses where more than one defendant is involved. See, e. g., Cupo v. United States, 123 U.S.App.D.C. 324, 359 F.2d 990 (1966) (Edgerton, J.), cert. denied, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967); United States v. Granello, 365 F.2d 990 (2d Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967), and King v. United States, 355 F.2d 700 (1st Cir. 1966). But see Scheve v. United States, 87 U.S.App.D.C., 289, 184 F.2d 695 (1950) (Edgerton, J.).

Sometimes cited in support of the majority reading of Rule 8 is the Advisory Committee Note to the Federal Rules of Criminal Procedure (Second Preliminary Draft 1944).[3] The crucial sentence states, "Subdivisions (a) and (b) are intended to keep distinct the joinder of charges and of defendants, a distinction which frequently is not observed." At 38. Arguably, at least, this sentence does not dictate the interpre-

---

2. Rule 8 provides:

   (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

   (b) Joinder of Defendants. Two or more defendants may be charged in the same in-

dictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

3. The terse final Advisory Committee Note to Rule 8, dated 1945, includes only three sentences and sheds no light on the current problem.

tation which the courts have given to Rule 8(b). Absent the bulk of precedent, the language and history of Rule 8 would leave the matter unsettled. Noting the Rule's drafting deficiencies, one leading commentator has observed that "[n]one of the Federal Rules has given rise to so much misunderstanding." 8 Moore's Federal Practice ¶ 8.02[1], at 8–2 (2d ed. 1976). Professor Wright's summary is helpful:

> It is firmly established in the case law that the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and that Rule 8(a) has no application. It may well be doubted if this was the intention of the draftsmen. It is quite possible that they contemplated that joinder of defendants would be proper if Rule 8(b) were satisfied and that Rule 8(a) would then be looked to in determining what offenses might be joined against the defendants so named. This would be consistent with the pattern of the Civil Rule that the draftsmen seem generally to have taken as their model.

1 C. Wright, Federal Practice and Procedure, § 144, at 318–19 (1969) (footnotes omitted.)

■ Assuming, then, that Rule 8(b) governs, the robbery count could be joined to the rest of the indictment only if all the offenses charged were part of "the same series of acts or transactions." According to the evidence presented at trial, the purse snatching which formed the basis of the robbery charge occurred shortly after the assault and in approximately the same location as the earlier crime. Since the two offenses were not otherwise related, the question becomes whether mere temporal and spatial proximity can justify characterization of the assault and the robbery as different parts of "the same series of acts or transactions".[4]

In *King, supra,* Chief Judge Aldrich espoused adoption of a pragmatic approach in determining when multiple offenses may be subsumed in a single "series of acts or transactions."

> [Joinder of offenses under] Rule 8(b) is not limited to situations in which proof of the other criminal transaction would be admissible in a separate trial. It goes beyond, to others, the excuse being the benefit to the courts. . . . [T]his possibility of benefit should explicitly appear from the indictment or from other representations by the government before trial. Classic examples of such a benefit are when there is an overlapping of issues, as, for example, when some

**4.** We emphasize the dissimilarity between the two incidents which formed the basis for appellants' original indictment. The jury found that the assault upon Ms. Kirch and Ms. Tritt was motivated by an intent to rape. No evidence presented at trial indicated that appellant Jackson sought to rob either woman. Ms. Kirch testified that she tried to persuade Jackson to leave her and her companion alone. In response, Jackson did not demand the women's money, but instead insisted that they proceed in the direction of the river. Indeed, the government has vigorously argued in its brief that the events as recounted at trial effectively preclude the possibility that robbery and not rape was the motive for the attack on Ms. Kirch and Ms. Tritt. *See* Brief for Appellee at 15b, 27.

By contrast, financial gain was clearly the sole purpose for the later purse snatching. That crime was accomplished from a moving automobile. No weapons were involved, and in fact, only the barest minimum of force was used. At most, a technical assault occurred, and no charge of assault, independent of the robbery count, was entered against appellants. The victims of the purse snatching were not the same women attacked earlier. Moreover, the Nakamuras were accompanied by a male friend. Finally, a search of the record discloses no evidence that appellant Johnson participated in any way in the encounter with Ms. Tritt and Ms. Kirch. Ms. Kirch did testify that she saw the man later identified as appellant Jackson emerge from a gold Chevrolet parked near the Pier Nine bar. She further testified that she saw "the form of a person sitting in the driver's seat" of that car. However, neither Ms. Kirch nor Ms. Tritt was able to see the face of the latter individual, and certainly neither woman identified appellant Johnson as the driver of the Chevrolet. Johnson was acquitted of all charges in appellants' first trial. This court has no basis in the record before it for assuming that Johnson was implicated in the assault with intent to rape, and, from the proof adduced by the prosecution in that record, the government would appear to have had little, if any, basis for assuming so at the time the indictment was returned.

defendants are charged with transporting stolen goods in interstate commerce and others are charged with receiving the goods, so stolen and transported, or when defendants are charged with conspiracy to conceal a crime that part of their number are charged with committing. Where, however, there are no presumptive benefits from joint proof of facts relevant to all the acts or transactions, there is no "series," Rule 8(b) comes to an end, and joinder is impermissible.

355 F.2d at 704 (footnote and citations omitted).

In its brief on appeal in this case, the Government devotes scant attention to the improper joinder point raised by appellants. The relevant section of the brief, Part IV, occupies little more than one page, and consists solely of a capsule summary of the facts, a reproduction of Rule 8(b), and a' bare assertion that the "circumstances provide more than adequate grounds for joinder." Brief for Appellee at 35.

In its opposition to defendants' motion for severance in the trial court, the Government did discuss the matter in greater detail. Relying on *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), the Government argued first that the robbery and assault herein "arose out of a continuing transaction or the same set of events," and that therefore "the evidence of each of the crimes on trial would be admissible in a separate trial for the other." Under these circumstances, the Government continued, joinder should clearly be permitted since "the prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials." 331

F.2d at 90. Secondly, the Government maintained that "the crimes charged are so interrelated that it would be impossible to adequately prove one without incidentally proving the other." Opposition to Defendants' Motion for Severance at 4.

Both prongs of the Government's position were expounded in thoroughly conclusory terms.[5] At no point did the Government indicate what facts, apart from defendants' presence at the approximate time and place of the two crimes, would be amenable to joint proof. Under the First Circuit's test in *King,* the very limited benefits to be derived in this case from the opportunity to present joint proof might well be thought to be insufficient to counterbalance the risk of prejudice created by joinder of the assault and the robbery.

On the other hand, the Commentary to the ABA Standards on Joinder and Severance reports that "[i]t is common to permit joinder of offenses committed at approximately the same time and place." Approved Draft of ABA Project on Minimum Standards for Criminal Justice at 12. Unfortunately for our purposes, this statement cannot be taken at face value. As examples of the general rule, the ABA Commentary lists "the killing of several people with successive shots from a gun or the successive burning of several structures," citing *Scott v. State,* 211 Wis. 548, 248 N.W. 473 (1933).[6] These illustrations do not correspond neatly to the facts presented in the current case. Here, we are confronted with *dissimilar* and apparently unconnected crimes, and we are provided with little or no indication of how or why defendants moved from one to the other. We know only that the crimes occurred at about the same time and about the same place.

**5.** The wording of the Government's Opposition to Severance in the District Court reveals the weakness of the Government's analysis. In the very sentence after its assertion that "[i]n the present case there is just such a 'continuing transaction or *the same set* of events' as the Court referred to in *Drew,*" the Government announced that "*the two sets* of crimes here are mutually admissible to show a common scheme or plan so that proof of one tends to establish the other, and also to show the identity of the defendants . . . as the perpetra-

tors of both the offenses . . . ." Opposition to Defendants' Motion for Severance at 4 (emphasis added).

**6.** The prosecution's theory in *Scott,* as revealed by the Wisconsin Supreme Court's recitation of the testimony at trial, was that all the fires had been started pursuant to a single arson plan. Thus, joinder was not sustained in *Scott* solely, or even primarily, on the basis of time-and-space congruence.

■ A possible additional problem with the ABA Commentary is that it focuses on the language of Rule 8(a), rather than 8(b). Where only a single defendant is involved, Rule 8(a) would allow joinder of offenses which are

> of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

The major distinction between subdivisions (a) and (b) lies in their treatment of offenses "of the same or similar character." As long as only one defendant is concerned, Rule 8(a) permits joinder of such offenses, even if they are entirely unrelated to each other. On the other hand, in the multiple defendant context, Rule 8(b) forbids joinder, even of identical crimes, unless those crimes are part of "the same series of acts or transactions." As this court has explained,

> When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results, and the same is true when several defendants are jointly charged with a single offense or related offenses. Rule 8(a) permits the first sort of prejudice and Rule 8(b) the second. But the Rules do not permit cumulation of prejudice by charging several defendants with similar but unrelated offenses.

*Cupo, supra* at 993 (footnote omitted). Indeed, courts differentiating between subdivisions (a) and (b) almost invariably do so in response to prosecutorial attempts to indict two or more defendants together for similar, but unrelated, crimes. *See, e. g., United States v. Whitehead,* 539 F.2d 1023 (4th Cir. 1976); *United States v. Marionneaux,* 514 F.2d 1244 (5th Cir. 1975), and *Granello, supra. See also* 1 C. Wright, Federal Practice and Procedure § 144, at 319 (1969) (approving the prevailing judicial construction of Rule 8).

Given the nature of the primary distinction between subdivisions (a) and (b) discussed in the preceding paragraph, speculation has arisen that Rule 8(b)'s phrase, "the same series of acts or transactions," may be essentially coterminous with the wording employed in the last portion of Rule 8(a), "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Professor Wright has stated the argument cogently:

> Rule 8(b) does not define what is meant by "the same series of acts or transactions." It is a less meaningful phrase than is used in Rule 8(a) where the phrase is "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Resort to the dictionary would permit any set of acts to be regarded as a "series," but if this were done, the purported limitation imposed by Rule 8(b) would be meaningless. One possibility would be to read "series" in Rule 8(b) as if it meant the kind of relation more specifically described in Rule 8(a). Thus if acts were part of a common scheme or plan, or connected together, they could be regarded as a series. Such a reading would not be inconsistent with the results reached in the cases.[7]

1 C. Wright, Federal Practice and Procedure, § 144, at 322 (1969). *See also* 8 Moore's Federal Practice ¶ 806[1], at 8–24; *Id.* ¶ 8.06[2], at 8–37 (2d ed. 1976).

Unhappily, resort to the language of Rule 8(a), even if compatible with precedent and the draftsmen's intent, brings us no closer to resolution of the controversy before us. For the fundamental question remains: Are crimes committed by the same persons around the same place and around the same time automatically sufficiently "connected together" to be joined in one indictment?

The general policy underlying Rule 8 might indicate an affirmative answer. Courts have frequently said that the Rule should be interpreted broadly in favor of

---

**7.** If Professor Wright's suggestion is accurate, the ABA Commentary, quoted above, would be highly relevant to Rule 8(b), even though explicitly intended to describe practice under 8(a). Of course, the lack of citation to cases with facts similar to those presented here would still diminish the persuasive value of the ABA remarks.

initial joinder. *See, e. g., Haggard v. United States,* 369 F.2d 968 (8th Cir. 1966), *cert. denied,* 386 U.S. 1023, 87 S.Ct. 1379, 18 L.Ed.2d 461 (1967); and *United States v. Friedman,* 445 F.2d 1076 (9th Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). The rationale for this canon of construction is twofold. First, Rule 8 is permissive, not mandatory. Initial joinder may be legitimate under the Rule, but the trial court may nevertheless grant a severance of some counts at a later time in order to avoid prejudice to the defendant (or the Government). *See* Fed.R. Crim.P. 14.[8] Since joinder of offenses in an indictment does not represent an irreversible commitment to joint trial of those offenses, conventional wisdom has favored a liberal reading of Rule 8.[9] Moreover, defendants may actually prefer joinder in some instances; in order to avoid the inconvenience and expense of successive trials and to minimize the potential for imposition of consecutive sentences, they may prefer, where the possibility of prejudice seems slight, to be tried simultaneously on all charges pending against them. *See* ABA Commentary, *supra,* at 11.

In sum, the joinder of offenses in this case presents an exceedingly close question under Rule 8. The Government has neither demonstrated nor alleged any logical link between the assault and the robbery of which appellants were accused. While joinder in a single indictment may well have been appropriate under the ordinary judicial construction of the governing Rule, one further point remains to be made regarding the peculiar role of the joinder issue in this case. Typically, when Rule 8 is invoked, the court's only problem is whether or not to sever.[10] In practical terms, the court must decide whether to conduct one trial or two.

Here, however, resolution of the joinder issue has *jurisdictional* significance. If the robbery count was not properly joined to the rest of the indictment, the District Court was not free to try it separately. Rather, the District Court would have lacked jurisdiction to try it at all. When Rule 8 is thus applied for jurisdictional purposes, the considerations counselling liberal construction of the Rule no longer seem compelling. Since Congress has determined that D.C. offenses should generally be tried in the D.C. courts, the joinder provisions of Rule 8 should not be strained to uphold federal jurisdiction over local crimes. We hold that, on the facts presented here, joinder of the robbery count with the other charges against appellants was improper, and therefore conferred upon the District Court no jurisdiction over the alleged D.C. Code offense of robbery.

8. Those persuaded of the virtues of Rule 14 might well contend that the concerns expressed by Chief Judge Aldrich in *King, supra,* are more appropriate for resolution of a motion to sever under Rule 14 than for the initial application of Rule 8.

9. At least one commentator, questioning the practical protection afforded by Rule 14, has voiced misgivings about the courts' tendency to approve joinder freely under Rule 8:

Rule 8 may be said to contain a built-in standard of prejudice, which simply means that any form of joinder not permitted by the terms of the Rule—*e. g.,* joinder of unrelated offenses against several defendants—is *conclusively* presumed prejudicial. This leaves a large area outside the protection of the Rule. The area is one in which relief under Rule 14 is available, but such availability tends to be more theoretical than real. The usual expression when a court is faced with a claim of prejudice under Rule 14 is that "persons jointly indicted should be tried together."

And a denial of relief rests in the virtually unreviewable discretion of the trial court. Thus, the prosecutor's initial manner of framing the indictment is likely to be the way in which defendants go to trial.

8 Moore's Federal Practice ¶ 8.02[1], at 8–4 (2d ed. 1976) (footnote omitted).

10. Part of the confusion in the area stems from the use of a single term, "severance," to describe the relief available under Rule 8 and Rule 14. *See* 8 Moore's Federal Practice ¶ 8.02[1], at 8–4 n. 12; *Id.* ¶ 8.04[1], at 8–12 to –13 (2d ed. 1976). This, despite the fact that severance may be required as a matter of law under Rule 8, whereas under Rule 14 it is a remedy within the discretion of the trial court. In either event, misjoinder under Rule 8 or prejudicial joinder under Rule 14, the practical consequence is not dismissal of the indictment, but simply a separate trial for the severed counts (or the severed defendants). *See, e. g., Haggard, supra.*

## IV

■ Alternatively, we assume that initial joinder of the robbery count was proper under Rule 8(b), and then address the District Court's retention of jurisdiction over the robbery count after severance pursuant to Rule 14. In this connection, the first point to be made is that *United States v. Shepard,* 169 U.S.App.D.C 353, 515 F.2d 1324 (1975), is not controlling. In *Shepard,* defendant was tried simultaneously for federal and D.C. offenses which derived from the same factual circumstances. At the close of evidence, but before submitting the case to the jury, the Government elected to dismiss the federal charge because of "discrepancies in the indictment." Thereafter, the District Court allowed the remaining counts of the indictment, alleging only D.C. crimes, to go to the jury. Defendant was convicted of armed robbery, and appealed, claiming that dismissal of the federal count deprived the District Court of jurisdiction over the joined D.C. offenses. This court affirmed, holding that

> where federal and local offenses have been properly joined in one indictment *and jeopardy has attached,* the District Court may proceed to a determination of the local offenses regardless of any intervening disposition of the federal counts.

515 F.2d at 1331 (emphasis added).

In its memorandum opinion retaining jurisdiction over the robbery count in the appeals now before us, the District Court stated, "Since jeopardy has not attached as to count nine, the explicit holding of *Shepard* [sic] is not dispositive." Counsel for appellants, both in his memorandum of law before the District Court and in his brief on appeal, conceded that, after severance of the robbery count and after completion of trial on the remainder of the indictment, no jeopardy had yet attached with respect to the robbery charge in the District Court. Memorandum of Law at 2, December 12, 1975; Brief for Appellants at 34. This plainly could not have been said concerning the D.C. crimes of which defendant was accused in *Shepard.* Those crimes had been completely tried to a jury before any question of the District Court's jurisdiction arose. And, as this court declared in *Shepard,* "Once the District Court swears in the jury, jeopardy attaches as to all counts in the indictment, both federal and local." This court's sustenance of District Court jurisdiction in *Shepard,* then, does not dictate a similar result in connection with the robbery offense at issue here.

In *Shepard,* the Government conceded that "the dismissal of all federal charges prior to trial would require the dismissal of the remainder of the indictment as well." 515 F.2d at 1329. *See also* Brief for Government in *Shepard* at 10. Appellants rely on this concession, and seek to analogize the situation after severance here to that in which all federal counts had been dismissed before trial. The Government now characterizes its own concession in *Shepard* as dictum of this court, "derived . . . from an incomplete research of the doctrine of pendent jurisdiction." Government's Memorandum in Support of the Court's Jurisdiction to Try the Remaining Robbery Count at 3. Thus the Government apparently wishes to repudiate its concession in *Shepard,* and to adopt instead the position that neither dismissal of federal charges before trial nor severance of such charges will negate federal District Court jurisdiction over properly joined D.C. offenses.

In support of its revised stance, the Government has marshalled two arguments. The first of these stresses the language of the relevant jurisdictional statute, 11 D.C.Code § 502(3) (1970). That provision, reproduced in the text at 6 *supra,* grants the District Court jurisdiction over any D.C. offense "joined in the same information or indictment with any federal offense." Commenting on § 502(3), the *Shepard* court said:

> This is unequivocal language. The statute makes no reference to any other disposition of the joined counts charging D.C. offenses in the event all counts charging federal offenses are dismissed [or, we may now add, severed].

515 F.2d at 1329. Indeed, the language *is* unequivocal. But that alone does not imply a Congressional intent that the federal courts should retain jurisdiction over purely D.C. offenses irrespective of the disposition of the federal charges whose joinder originally conferred jurisdiction over the local crimes. On the contrary, the lack of qualification in § 502(3) suggests that Congress, in framing the District of Columbia Court Reform and Criminal Procedure Act, simply did not consciously confront the sort of problem presented here. A search of the House, Senate, and Conference Committee Reports accompanying the Act has yielded nothing more than the lone comment already uncovered by the *Shepard* court:

> Some overlapping of jurisdiction will inevitably remain, that being only a minor percentage of cases primarily arising when the same person is accused of infractions which are both Federal and purely local violations (and in those cases the United States Attorney will handle all charges with minimal procedural difficulties).

H.R.Rep.No.91–907, 91st Cong., 2d Sess. 33 (1970). This controversy, of course, belies the optimism of the House Committee's parenthetical remark. In short, the legislative history is unhelpful, and, if anything, cuts against the Government's ascription of substantial significance to the unqualified language of § 502(3).

To bolster its case in favor of the District Court's retention of jurisdiction over the severed robbery count herein, the Government has turned to the civil law doctrine of pendent jurisdiction. In particular, the Government seeks to draw support from *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). There, plaintiffs attacked the New York Social Services Law as violative of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs also asserted that the same state statute was incompatible with the federal Social Security Act. The Supreme Court held that, despite the undisputed mootness of plaintiffs' constitutional claim, the District Court nevertheless properly exercised jurisdiction over the pendent statutory

claim. 397 U.S. at 402–05, 90 S.Ct. 1207. After a brief review of the *Rosado* decision, the Government concludes, "If 11 D.C.Code § 502(3) does not compel the trial court to retain jurisdiction [over the robbery count] in these circumstances, the doctrine of pendent jurisdiction clearly allows it." Brief for Appellee at 39.

This extrapolation from *Rosado* is questionable for at least two reasons. First, as a general matter, wholesale importation of civil law concepts into the criminal sphere is a practice fraught with danger. While recognizing that "the doctrine of pendent jurisdiction has only been applied in civil cases and thus is not directly relevant in the criminal context presently before us," the *Shepard* panel did indicate that the pendent jurisdiction analogy might prove useful in the interpretation of § 502(3). 515 F.2d at 1330–31. However, this analogy must be applied with great care. As Professor Moore has commented in connection with Rule 8, "The civil model . . . is often inappropriate in criminal procedure, and no subject illustrates this fact better than joinder." 8 Moore's Federal Practice ¶ 8.02[1], at 8–3 (2d ed. 1976). Efficiency—"the conservation of judicial energy and the avoidance of multiplicity of litigation"—may be pursued with single-minded devotion in the rules and doctrines of civil procedure, but, on the criminal side, solicitude for efficient judicial administration must sometimes give way to the need to protect the rights of defendants.

Secondly, and completely apart from broad doubts concerning the transferability of civil law concepts to the criminal arena, the facts in *Rosado* made the notion of pendent jurisdiction much more appealing there than it is here. Justice Harlan's opinion for the Court called attention to the two primary factors affecting the discretionary exercise of pendent jurisdiction: "the extent of the investment of judicial energy and the character of the [pendent] claim." 397 U.S. at 403, 90 S.Ct. at 1213. In *Rosado,*

> [n]ot only had there been hearings and argument prior to dismissal of the consti-

tutional claim, but the statutory question is so essentially one "of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." *Id.* at 403–04, 90 S.Ct. at 1213 (footnote omitted). Here, at the time of severance, virtually no judicial energy had been directed toward disposition of the robbery count; moreover, defendants' ultimate guilt or innocence of the robbery charge implicated federal law not at all. Thus, even accepting the basic legitimacy of the pendent jurisdiction analogy, *Rosado* offers little or no encouragement for the Government's attempted reliance on the concept in this case.

To recapitulate, neither *Shepard,* nor the language of § 502(3), nor the doctrine of pendent jurisdiction, provides convincing support for the District Court's retention of jurisdiction over the robbery count herein. Likewise unpersuasive in light of the strong Congressional policy favoring trial of D.C. offenses in the D.C. courts are the various spectres which, the Government and the District Court warn, will haunt the judicial process if severance triggers a lapse of federal jurisdiction here: inevitable delay arising from the need to reindict, possible relitigation of preliminary issues already once resolved by the federal courts, and inhibition of the trial court's decision on whether to grant severance in order to avoid prejudice.

Finally, and perhaps most importantly, the District Court should not retain jurisdiction after severance here because of the close relationship between Rules 8 and 14. As explained earlier (see notes 8 and 9 and accompanying text *supra* ), liberal joinder is generally permitted under Rule 8 because trial courts know they can take refuge in Rule 14 upon a showing that a joint trial may prejudice defendant(s). Since severance for misjoinder under Rule 8 unquestionably leaves the District Court without jurisdiction over the severed counts (where those counts allege purely local offenses), and since, under prevailing practice, severance pursuant to Rule 14 is frequently a substitute for severance under Rule 8, the District Court's reliance here on Rule 14 rather than Rule 8 should not have the far-reaching jurisdictional consequences which the Government would attach to it.

———

The responsibilities of the District Court with respect to matters of federal concern are great and growing. A central purpose and policy of D.C. court reorganization was to assure that the prompt and effective discharge of those responsibilities would not be impeded by the necessity of trying local criminal offenses, for which a forum was provided in an enlarged and strengthened local court system. The authority conferred by 11 D.C.Code § 502(3) should not be extended by either prosecutor or judge beyond its precise limits. Upon either of the two grounds articulated in this opinion, we find the District Court to have been lacking in jurisdiction with respect to the charge of robbery.

Appellants' robbery conviction is therefore reversed. The remaining convictions of appellant Jackson are affirmed.

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

I join the majority's disposition, in Part II of its opinion, of the issues of probable cause for appellants' arrest and sufficiency of the evidence to support appellant Jackson's conviction of assault with intent to rape, but disagree with its conclusions regarding the district court's jurisdiction over the robbery count.

I

In a nine-count indictment returned by a grand jury in the United States District Court for the District of Columbia, appellants were charged with the following:

(1) Possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (1970).

(2) Possession of a firearm not identified by serial number in violation of 26 U.S.C. § 5861(i) (1970).

(3), (6) Assault with a dangerous weapon with intent to carnally know (rape) Kathy M. Kirch and Dari R. Tritt in violation of D.C. Code §§ 22–501, –3202 (1973) (2 counts).

(4), (7) Assault with intent to carnally know (rape) Kathy M. Kirch and Dari R. Tritt in violation of D.C. Code § 22–501 (1973) (2 counts).

(5), (8) Assault of Kathy M. Kirch and Dari M. Tritt with a dangerous weapon in violation of D.C. Code § 22–502 (1973) (2 counts).

(9) By force and violence and against resistance and by putting in fear, stealing and snatching a purse and its contents from Marliese T. Nakamura, in violation of D.C. Code § 22–2901 (1973).

Both defendants Jackson and Johnson were charged together as defendants in *all* nine counts. The District Court, however, granted defendants' motions to sever the *Ninth Count* charging stealing by force and violence.

In the first trial the jury acquitted Johnson on all counts but found Jackson guilty of the federal firearms violations and of two counts of assault with intent to commit rape while armed with the illegal firearm, a "sawed-off rifle."

After the first trial of the federal and D.C offenses charged in the first eight counts, the trial court ruled that it had jurisdiction to try the remaining robbery count, a single D.C. offense. In the jury trial that followed both appellants were found guilty as charged. The principal question presented on appeal is whether, under the Federal Rules of Criminal Procedure and the statutes enacted by Congress for the trial of crimes committed in the District of Columbia, the federal crimes and the D.C. charges arising out of the earlier assaults were properly joined in one indictment with the successive crime of robbery by force and violence. One subordinate issue is whether the two defendants can properly be joined in all the offenses charged. The validity of the separate trial in the U.S. District Court of the D.C. offense of robbery by force and violence depends upon the answers to the foregoing questions.

The robbery was committed about 10 minutes after the first offenses ceased. It was committed at exactly the same place where the first offenses began. The defendants used the same gold Chevrolet car as a staging ground for both offenses. The offenses were similar in that they both involved forcible assaults upon women and the grand jury alleged that the same two defendants jointly committed all nine alleged offenses.

The court's opinion states that joinder of offenses under Fed.R.Crim.P. 8 is normally construed broadly, and that in this case it presents a "close" question. It concludes, however, that because the *jurisdiction* of the U.S. District Court depends on the propriety of the joinder, the rules on joinder should be read more narrowly out of deference to the claimed intent of Congress to have D.C. offenses tried in the D.C. courts. In my view we should give Rule 8 the *normal reading* that it is given in all other instances, and we should not overlook the clearly expressed intent of Congress that when federal and D.C. offenses may properly be joined neither the defendants nor the Government should be subjected to separate trials in the United States and D.C. courts. This is an important case because of the large number of criminal cases we have where the offenses violate both federal and D.C. statutes.

II

In my opinion, it was proper to join the D.C. robbery offense with the federal and D.C offenses. D.C. Code § 11–502 (1973) provides:

In addition to its jurisdiction as a United States district court and any other jurisdiction conferred on it by law, the United States District Court for the District of Columbia has jurisdiction of the following:

. . . . .

(3) *Any* offense under *any* law applicable exclusively to the District of Columbia which offense is *joined* in the same information or indictment with *any* Federal offense.

802

Act of July 29, 1970, Pub.L. 91–358, § 111, 84 Stat. 477 (emphasis added). The language of this statute is unequivocal. *See United States v. Shepard,* 169 U.S.App.D.C. 353, 358, 515 F.2d 1324, 1329 (1975). It confers jurisdiction on the United States District Court of crimes against the District of Columbia when they are *"joined* in the same . . . indictment with *any* federal offense" (emphasis added). The court's opinion asserts that the term "joined" in section 11–502(3) means "properly joined under Fed.R.Crim.P." (Maj. op. at —— of 183 U.S.App.D.C., at 793 of 562 F.2d. I agree. The offenses must be properly joined. I believe they were.

To determine if they were properly joined requires reference to Fed.R.Crim.P. 8, which relates to joinder of offenses and defendants. This rule provides:

(a) Two or more *offenses* may be charged in the same indictment . . . if the offenses charged . . . are based on . . . *two or more acts or transactions connected together constituting parts of a common scheme or plan.*

(b) Two or more defendants may be charged in the same indictment . . . if they are alleged to have participated . . . in the *same series of acts or transactions constituting* . . . *offenses.* . . .

(Emphasis added.) The majority has difficulty fitting the offenses and defendants here within the language of Rule 8 and also has difficulty disengaging the offenses from that Rule. Its exposition of the case law is well done, but, in my view, the majority does not correctly discern or apply all the relevant facts of the present case.

The majority agrees with the weight of authority, despite the facial language of the rule, that joinder of offenses against one defendant is governed by Rule 8(a), while 8(b) controls joinder of offenses against multiple defendants. It concedes, however, that "Rule 8(b)'s phrase, 'the same series of acts or transactions,' may be essentially coterminous with the wording employed in the last portion of Rule 8(a), 'two or more acts or transactions connected together or con-

stituting parts of a common scheme or plan.' " Maj. op. at —— —— of 183 U.S.App.D.C., at 796 of 562 F.2d, quoting 1 C. Wright, Federal Practice & Procedure § 144, at 332 (1969) and citing 8 J. Moore, Federal Practice ¶ 8.06[1] at 8–24, ¶ 8.06[2] at 8–37 (2d ed. 1976). Whichever language is preferred, contrary to the majority opinion here, I conclude that the D.C. robbery offense was properly joined with the other federal and D.C. counts.

First, take subsection (a) of the Rule. Are the acts involved in the crime of robbery by force and violence, as charged in count 9, "parts of [the] common scheme and plan" alleged in counts 1 to 8 of the indictment? Six of the first eight counts charge assaults upon women which began outside the Pier 9 restaurant. Initially the occupants lay in wait in the car and then drove around the area until they reached an advantageous location from which their intended victims could be accosted (Tr. 304, 376). This obviously permitted them to conceal the sawed-off rifle from their intended victims until they were reasonably close to them. Then, Jackson emerged from the gold Chevrolet brandishing a 23-inch sawed-off rifle, the possession of which is the basis for the two other counts. So all of these eight offenses were clearly related. When Jackson emerged from the passenger side of the car it became obvious, particularly when the facts in connection with the robbery are considered, that another person was in the driver's seat.

Four of the first eight counts charge an "intent to carnally know" the female victim; but two counts (5 and 8) do not allege an intent to rape and only charge simple assaults with a dangerous weapon. These latter two counts obviously refer only to the initial assaults that were committed outside the Pier 9 restaurant in which Jackson hit Ms. Kirch in the face, eye and nose, knocking her to the ground with her nose bleeding (Tr. 87). Thereafter the victims were forced to go a short distance to the river bank where Jackson's sexual motivation first manifested itself. At the river bank one of the intended victims kicked Jackson

in the shins, wrested the sawed-off rifle from him and he ran from the river toward Pier 9 (Tr. 119).

Then, within the short space of about 10 minutes (*cf.* Tr. 304, 376) from the time he ran from the river bank, while Johnson was driving the gold Chevrolet, as the majority opinion states, the car

approached slowly. A man [Jackson] in the passenger seat of the Chevrolet reached out the car window and grabbed Ms. Nakamura and her purse. The young woman was dragged approximately ten feet before she let go of her handbag.

Maj. op. at —— of 183 U.S.App.D.C., at 791 of 562 F.2d. The Chevrolet then sped away with Johnson driving. Jackson and Johnson were arrested shortly thereafter in the gold Chevrolet in front of one of their homes. A sock with 55 rounds of ammunition that fit the sawed-off rifle was found on the front seat of the car between the driver and the passenger seats.

It is submitted that these facts show a common scheme and plan to use the Chevrolet as a staging platform to wantonly assault women with force and violence as they emerged from the Pier 9 restaurant. The only reason the sawed-off rifle was not used in the assault that resulted in the robbery was because Ms. Kirch had taken it away from Jackson—but he carried on as best he could without the rifle by grabbing Ms. Nakamura with "force and violence and against resistance," count 9.

The majority opinion attempts to differentiate the assault that occurred in connection with the robbery from the other assaults by asserting: "At most a technical assault occurred, and no charge of assault, independent of the robbery count, was entered against appellants." Maj. op. at —— n. 4 of 183 U.S.App.D.C., at 794 n. 4 of 562 F.2d. The offense, as charged in the indictment, cannot be minimized into being merely "a technical assault." It alleged that Johnson and Jackson used "force and violence . . . against resistance [resulting in] putting [the victims] in fear . . . ." (Count 9). And the "force and

violence as proved by the evidence at trial was principally that of a moving car dragging a female victim held by the arm of one of the defendants against the car's side. That is every bit as much force as that used in the other assaults and there is nothing "technical" about it. The force was actual. As for the assertion that no assault charge "independent of the robbery count, was entered against appellants," no independent count was necessary—the assault was adequately charged in connection with the robbery, and that count clearly encompassed a simple unlawful assault (D.C.Code § 22–504) as a lesser included offense. The use of the car in connection with the assault would also, in my opinion, embrace the offense of assault with a dangerous weapon (D.C.Code § 22–502).

Robbery by force and violence and against resistance was charged in the indictment. Assault is an essential element of the offense of robbery. "Some violence or intimidation (both of which involve an assault) must be used in the taking, or it is merely larceny." J. Miller, Criminal Law 393 (1934), and cases cited at n. 14. A robbery is a form of aggravated assault, and no valid distinction can be drawn between this "assault" and that alleged in six of the other counts.

When one recognizes that the robbery and six of the eight remaining counts *did* involve assaults on women originating from the gold Chevrolet at the Pier 9 restaurant, the common scheme and plan—to lie in wait in the Chevrolet and make wanton assaults on women—is obvious. The majority opinion recognizes that the Commentary to the ABA Standards on Joinder and Severance state that "[i]t is common to permit joinder of offenses committed at approximately the same time and place." Maj. op. at —— of 183 U.S.App.D.C., at 795 of 562 F.2d. However, the majority considers that it is unable to apply that rule here because it states it is "confronted with *dissimilar* and apparently unconnected crimes." Maj. op. at —— of 183 U.S.App.D.C., at 795 of 562 F.2d, (emphasis in original). However, when note is taken that the robbery is

basically an "assault," as the majority admits, and that Jackson used the Chevrolet to mask his approach to all the assault victims, and Johnson was alleged to be the driver of the car throughout, the claim that the offenses are "dissimilar" completely disappears. They are similar in that all are forcible assaults on women and all began from the Chevrolet at the Pier 9 restaurant with Johnson driving and Jackson assaulting.[1] These *offenses* were therefore properly joined.

### III

The majority intimates that the standards of Rule 8(b) may be more difficult to satisfy than those of Rule 8(a). Rule 8(b), however, differs on its face from the former only in that it does not permit joinder based solely on "similar" acts. *See United States v. Roselli*, 432 F.2d 879, 898 (9th Cir. 1970). Rather, joinder under 8(b) depends upon a showing that the offense charged in the indictment grew out of "the same series of acts constituting . . . offenses." What does the same "series" of acts require? A "series" is defined as:

> a group of . . . three or more . . events standing or succeeding in order and having a like relationship to each other: *a spatial or temporal succession of persons or things* . . . .

Webster's Third New International Dictionary 2073 (1963) (emphasis added). The majority recognizes that Rule 8(b) presents the "question . . . whether mere temporal and spatial proximity can justify characterization of the assault and robbery as different parts of 'the same series of acts . . . ,' " Maj. op. at —— of 183 U.S.

App.D.C., at 794 of 562 F.2d. But having correctly stated the question, the majority both overstates the answer and erroneously applies the rule to the facts of this case.

The majority relies upon decisions that have suggested that the term "series" in the context of Rule 8(b) contemplates something "[more than] mere temporal and spatial proximity." For example, in *King v. United States*, 355 F.2d 700, 704 (1st Cir. 1966), The First Circuit stated that "[w]here . . . there are no presumptive benefits from joint proof of facts relevant to all the acts or transactions there is no 'series' " within the meaning of Rule 8(b). Similarly, the Seventh Circuit in *United States v. Isaacs*, 493 F.2d 1124, 1159 (7th Cir. 1974), permitted joinder of dissimilar counts against multiple defendants where "[t]he evidence to establish the counts in question was pertinent to proof of other counts."

A closer look at these decisions, however, reveals that these courts do not require that the facts in each count be absolutely probative of the other. Rather, they simply require a sufficient logical connection between the counts that the added convenience from their joinder offsets the potential prejudice to the defendants. "Rule 8(b) is not limited to situations in which proof of the other criminal transaction would be admissible in a separate trial. It goes beyond, to others, the excuse being the benefit to the court." *King, supra*, 355 F.2d at 704. Rule 8(b) thus permits joinder based on "a series of many occurrences dependent not so much upon the immediateness of their connection as upon their *logical relationship*." *Isaacs, supra*, 493 F.2d at 1159, *quoting Moore v. New York Cotton Exchange*,

---

1. This is the obvious theory upon which the counts were joined in the indictment and there were sufficient facts to support such joinder. The propriety of the joinder in the indictment is determinative of the court's jurisdiction to try all counts joined therein and the fact that Johnson, in a separate trial, was subsequently acquitted on the first eight counts is not controlling. Had all the charges been tried jointly, as they were charged, the facts concerning the robbery would have been placed before the jury in a more meaningful light with the evidence on the first eight counts. Then John-

son's role as the standby driver of the car he and Jackson had planned to have available if escape became necessary would have been apparent to the jury and could have led to his conviction as an aider and abettor to the first eight counts. The jury could have found that Johnson at the very outset used the car to conceal the 23-inch sawed-off rifle. The cases thus should not have been severed. The prejudice that was discerned from the facts of count 9 was the certainty that Johnson also aided and abetted the first eight counts and that type of prejudice does not justify severance.

270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926) (emphasis added). *Accord, United States v. Laca*, 499 F.2d 922, 925 (5th Cir. 1974); *United States v. Gill*, 490 F.2d 233, 238–39 (7th Cir. 1973); *United States v. Daddano*, 432 F.2d 1119, 1125 (7th Cir. 1970); ("even if each set of events [a Hobbs Act violation and subsequent perjurious statement to a grand jury] be deemed a separate transaction, we think the relationship is close enough that they may be deemed a 'series' under Rule 8(b)").

The events in the present case, far from being "dissimilar," as the majority characterizes them, were striking in their similarities:

(1) These offenses all began at *the same place*—outside the Pier Nine Restaurant.

(2) The *same automobile* was used in connection with both offenses.

(3) The robbery followed the assaults *within ten minutes* of their termination.

(4) The *same principals* were involved.

(5) Both offenses involved *similar victims*—women who had just left the Pier Nine restaurant.

(6) All offenses, except the two Federal firearms offenses, involved assaults and the firearm was used in some of the assaults. Counts 3 through 8 alleged assaults, four with intent to rape, and two with a dangerous weapon and the ninth count charged stealing by seizure and snatching "by force and violence and against resistance and putting in fear."

(7) It is a reasonable conclusion from all the facts that all offenses involved some coordinated activities by each defendant. Johnson drove the car and Jackson assaulted the women.

(8) It was also part of the common scheme and plan that Jackson and Johnson would keep the gold Chevrolet ready and available as a get-away car with extra ammunition *readily available* for the rifle in case they needed it. This latter facet of the plan was frustrated when Ms. Kirch took the rifle away from Jackson. The ammunition on the front seat also links the car to the first eight offenses and there is no doubt about its relationship to the robbery.

Not only do these events, closely connected in time and place, fit within the dictionary meaning of the word "series," but the facts surrounding each offense were probative of the other offenses. In particular, the interrelationship of all of the facts alleged in the indictment tends to prove the identity and extent of involvement of appellant Johnson, whose participation was apparently limited to driving the car that figured centrally in each event. The car was not only driven during the commission of the robbery, but also conveyed Jackson to the scene when he made his first assaults that led to the attempted rapes. Jackson got out of the car from the "passenger side" to accost Ms. Kirch and Tritt (Tr. 304–05, 364). The testimony of Ms. Nakamura tended to prove that Johnson was in fact the driver of the car at that time. Being in the car had permitted Jackson to conceal the sawed-off rifle with which Jackson threatened the women and this in part explains both the presence of the weapon and Johnson's complicity in the firearms and subsequent violations. The factual inference is obvious that Johnson was the driver and waited in the car for Jackson because following the short fifteen minutes (*cf.* Tr. 304, 376) between the time Jackson first assaulted Ms. Kirch and Tritt and the time he had returned from the river bank and assaulted Ms. Nakamura in the robbery, Johnson turned out to be the driver during the robbery. The facts of the series of crimes are thus closely interrelated and the prosecution thus would have benefited greatly "from joint proof of facts relevant to all the acts or transactions . . . ." 355 F.2d at 704, and the events should be considered a "series" within the meaning of Rule 8(b), even as construed by the *King* court. Johnson probably owes his acquittal on all counts at the first trial to the trial court's decision to sever the robbery count from the others for trial.

In my opinion, these factual similarities form a sufficient logical and probative link between the activities upon which the indictment was based that they were properly considered part of the "same series of acts or transactions constituting . . . offenses" within the meaning of Rule 8(b). They meet all the requirements of the case law discussed in the majority opinion.

## IV

The only remaining question is whether, once the D.C. robbery offense was severed from the counts charging the federal firearms violations and the D.C. rape assault offenses, the District Court retained jurisdiction to try the robbery count, or was required to dismiss the count for possible re-indictment by the D.C. grand jury and trial in the Superior Court for the District of Columbia. However, it is my view that Congress conferred jurisdiction on the United States District Court over such D.C. robbery offense since it was properly "joined in the same . . . indictment with [a] Federal offense." D.C.Code § 11–502(3) (1973).

To hold that the United States District Court lost jurisdiction when the case was severed imports into the statute considerations which Congress did not see fit to enact. While the Congress created the D.C. court, *inter alia*, to try D.C. offenses, it also provided that U.S. and D.C. offenses could be joined in one indictment and tried together in the U.S. courts so as to serve the convenience of defendants, the Government, the witnesses, lawyers, and grand and petit juries. The majority's interpretation requires re-indictment by a grand jury of the Superior Court of the District of Columbia and double trials where a great deal of the same testimony will be duplicated—particularly that dealing with identification. Two trials in different courts that substantially overlap are a burden to everybody and, as the majority opinion notes, defendants may frequently benefit from a single trial in the United States courts by receiving concurrent rather than consecutive sentences. Moreover, requiring trans-

fer of D.C. counts to the Superior Court whenever severed from federal counts *encourages* such severance. This further nullifies the congressional intent in directing joint trials. Such should be the result where the D.C. case is *improperly* joined but not where cases are properly joined as here.

To my mind the majority relies too much on the intent to create separate court systems and not enough on the intent to authorize joint trials of federal and D.C. offenses that may properly be joined. The serious crime situation in the District of Columbia was at the heart of the legislation, and the authorization of joint trials for federal and D.C. offenses indicated that Congress intended to insure that *both* types of offenses were prosecuted with the least complications possible. If separate trials in separate courts were required, the staggering criminal docket in this city might compel the U.S. Attorney to settle for half justice in many cases where U.S. and D.C. crimes were concerned. That Congress did not so intend, but instead intended to reduce the staggering burden of prosecuting criminal cases in the District of Columbia by consolidating trials where joinder is proper is discernible from the specific statute authorizing such joint trials and also from the fact that it retained the United States Attorney as the criminal prosecutor in both the federal and D.C. courts. I thus believe that the majority opinion incorrectly concludes that Congress intended that the authority of the grand jury to join offenses should be narrowly construed against joinder whenever so doing would result in the grant to the United States District Court of jurisdiction over a D.C. offense. Instead, it is my view that Congress intended that the joinder rule should receive the same *normal construction* in such cases that it receives in all cases.

I agree with the majority, however, in not urging pendent jurisdiction as a basis for joint criminal trials in the United States courts. In addition, I would not hold for joint trials or continuing District Court jurisdiction if the severance had been granted

because the joinder was illegal *ab initio*, rather than on a discretionary basis, as for alleged improper prejudice.

For the foregoing reasons, I respectfully dissent from Parts III and IV of the majority opinion and the reversal of the robbery convictions.

